WILLIAM H. NUTTER, APPELLEE, v. STANDARD LAND COMPANY ET AL., APPELLANTS.

FILED DECEMBER 19, 1916. No. 19063.

Appeal: REMITTITUR. Where, in a case appealed to this court, the record clearly shows that the judgment is excessive in a certain amount, a remittitur will be ordered, and if the remittitur is not filed the judgment will be reversed.

APPEAL from the district court for Buffalo county: BRUNO O. HOSTETLER, JUDGE. Affirmed on condition.

Fred A. Nye, John A. Miller and Strode & Beghtol, for appellants.

W. L. Hand and N. P. McDonald, contra.

BARNES, J.

This was an action to recover damages which plaintiff alleged he had sustained by reason of deceit and fraud practiced upon him by the defendants the Standard Land Company and Samuel C. Hawthorne, in exchange of plaintiff's land situated in Buffalo county, Nebraska,

for certain land of the Standard Land Company situated in Hidalgo county, in the state of Texas. A trial in the district court for Buffalo county resulted in a verdict in favor of plaintiff for $16,806.79. Defendants' separate motions for new trial were overruled. Judgment was rendered on the verdict, and both defendants have appealed.

The record contains a copy of plaintiff's petition, in which it is alleged, in substance, that defendants, the Standard Land Company and Samuel C. Hawthorne, in order to induce the plaintiff to make the contract for the exchange of the real estate described therein, represented to plaintiff that a part of the land which he took in exchange contained 210 acres of what is called the lower lift land, situated near the Rio Grande river in Hidalgo county, and described as certain lots in block 14, all good, tillable and irrigable land, and having no resaca or lake thereon; that it was worth $150 an acre, and was not subject to overflow; that plaintiff relied on defendants' representations and believed the same, and had no opportunity to ascertain the facts in relation to the amount of land in the tract above mentioned; that a resaca was situated thereon, and that he had no means of knowing the value and quality thereof; that defendants' representations and statements were false and untrue in this, that in fact and in truth there was situated thereon a resaca which covered about 60 acres; that the land was subject to overflow, which rendered it valueless; that the remainder of the tract was in truth and in fact not worth over $25 an acre; and that the tract of land contained only 201.72 acres, instead of 210.72 acres as represented. Plaintiff prayed for a judgment for $26,565 and costs.

The defendants filed separate demurrers to the petition, which were overruled, and the defendants each excepted. They then filed separate answers. Hawthorne, by his answer, denied that he was either an officer or stockholder of the Standard Land Company when the trade was consummated, and alleged that he made no repre-

sentations whatever to the plaintiff; that he received no benefits out of the exchange of plaintiff's land for that of the Standard Land Company, and denied each and every allegation contained in plaintiff's petition. He prayed for a dismissal of the action.

The defendant Standard Land Company, by its answer, alleged that it is not now, and never has been, a resident or citizen of the county of Buffalo, in the state of Nebraska; that it did not at any time enter into any of the dealings or transactions with Samuel C. Hawthorne or Ralph R. Langley, as its president, as alleged in plaintiff's petition; that it had not at any time incurred a joint liability with its codefendants Samuel C. Hawthorne and Ralph R. Langley in any of the matters set up in plaintiff's petition; that no summons or process of any nature had been served upon the defendant Standard Land Company in Buffalo county, Nebraska, and that it had never voluntarily appeared in said action; that plaintiff wrongfully and collusively joined this defendant with its codefendants Samuel C. Hawthorne and Ralph R. Langley, for the purpose of forcing this defendant to defend said action in a county other than that of its residence; that, by reason of the matters and facts above stated, the court has no jurisdiction over the Standard Land Company in this action. For further answer to the petition, the defendant Standard Land Company alleged that its codefendants Samuel C. Hawthorne was not at any of the times complained of in plaintiff's petition an agent of this answering defendant, nor its representative in any matter, nor was said Samuel C. Hawthorne connected in any way with this answering defendant; that this answering defendant had no part in any transactions by Samuel C. Hawthorne with the plaintiff; and for further answer to the petition the defendant denied each and every allegation therein, and concluded its answer with a prayer that it go hence without day and recover its costs.

Separate motions were filed before the commencement of the trial requiring the plaintiff to elect whether he would try the case for false representations concerning the land which he had purchased, or whether he would rely for his case upon the allegations that he was shown other land than that which he actually received and contracted for, or whether he would prosecute this action for failure to obtain title to the land actually bought. The court overruled the motions, and defendants excepted.

The case coming on for trial, each of the defendants objected to the introduction of any evidence for the reason that the petition failed to state facts sufficient to constitute a cause of action, which objections were overruled. The defendants separately excepted to each of the instructions given and refused by the trial court.

Among other things, appellants contend that the evidence is insufficient to support the judgment, and that the verdict was excessive. These assignments of error will be first considered.

The testimony of plaintiff as found in the record is, in substance, as follows: He was a farmer 55 years of age, and prior to entering into the contract with the Standard Land Company was the owner of 480 acres of land near Gibbon, in Buffalo county, Nebraska, and 800 acres situated on an island in the Platte river in that county; his lands were heavily incumbered, and in April, 1911, Mr. Butcher, agent for the Standard Land Company, induced him to make a trip to the lower Rio Grande valley in Texas. They met defendant Hawthorne at Lincoln, and went with an excursion party of the Standard Land Company. On arriving in Texas, they met Mr. Langley, the president of the company. They remained in Texas, in and near San Juan, for about two days. He was taken around the country in an automobile. He entered into a contract with the company to purchase about 80 acres of land. He made another trip to San Juan, Texas, in the fall of 1911, and stayed there for six weeks, at that time putting up cane for the

defendant company. When he was in Texas on his first trip, he went over the lower lift with an excursion party. The lower lift is about a mile south of San Juan. When he was down there in the fall of 1911, he became acquainted with the country all around San Juan. He returned in December, and saw Mr. Hawthorne about the 10th of that month. They talked about Texas lands. The next time he saw Mr. Hawthorne was in Omaha on May 20, 1912, at the Standard Land Company's office. Plaintiff said: "I told him, * * * I wanted to either call this deal off or go through with it." Hawthorne told plaintiff that he had sold off part of the Texas land which was in his contract; that they could make up the difference by including land on the lower lift. Plaintiff said he told Hawthorne that he either wanted to call the deal off or go through with it; that Hawthorne told him that he thought he had sold off part of the land that was in his contract, but that they could make up the difference by including land on the lower lift, which was priced at $150 an acre; he said this land did not need fertilizing, that it would raise anything the upper lift would; he said the land did not generally overflow, but that it had overflowed 17 and 30 years ago; that he intended to take a piece of this land, as it was the very best. Plaintiff said Mrs. Nutter was with them; that he relied on Hawthorne's statements and believed everything he said up to that time; that Hawthorne went out; that Langley called them into his room, and that he told Langley that he was there to close the deal or call it off. Langley stated, in substance, the same as Hawthorne had told him. Langley told him there were 210.72 acres they could substitute on the lower lift, and that it never overflowed; that he relied on Langley's statements and entered into the contract; that after they signed the contract which was read to him they went out to dinner, and he did not see Hawthorne again that day. Nutter further testified that they wanted him to sign the vendor's lien notes, but he would not sign them until he had

seen the land; that they were afterwards sent down to Texas for his signature and he signed them; that he got his deed for the upper lift lands, but never got a deed for the land on the lower lift. Langley said that Mr. Kean would show him the lower lift land. Nutter testified further that they all went down to Texas on the following 4th of June; that they saw Mr. Kean there; that they had an automobile and went out to look at the land. Mrs. Nutter went along. They went across the basin and it was dry. Kean showed him the northwest corner of the land. Nutter testified that he got out several times and looked the tract over; that he had no information as to the corners, except what Kean and Langley had told him. They stayed down there until August, when they returned to Nebraska. They went back to Texas in October, when they decided to go down and see the land on the lower lift again, which they did. They found water there. Hawthorne and Langley were there then, and Hawthorne took off his shoes and waded across the water, which covered some 20 or 30 rods in width. They went down later, on Thanksgiving day, and the water was then about 10 or 12 rods wide. He testified that his land near Gibbon was priced in the exchange at $125 an acre, and his land on the island was put in at $50, making a total valuation of $55,656.

The contract made May 20, 1912, was introduced in evidence, and provided, in substance, as follows: The Standard Land Company had sold to the plaintiff 445.61 acres of land in Hidalgo county, Texas; the payment for said land and the price named in the contract was $150 an acre, the amount being $66,841.50. Plaintiff agreed to convey by warranty deed to Dan W. Gaines his lands in Buffalo county, 320 acres of it at the price of $41,200; 800 acres, known as the Island farm, was taken at $32,000. It was agreed that the land company should allow plaintiff the sum of $3,200, being a loss sustained on the former sale of real estate. The land

company was to have $2,335, making a total of $74,065.
It was agreed that the lands deeded by the plaintiff and
his wife to C⁴ines were subject to liens or incumbrances
to the amount of $22,000 and no more. The Standard
Land Company agreed to pay plaintiff the sum of $5,000
with which to pay off certain indebtedness on his home
in Gibbon, Nebraska, with the further sum of $5,000, as
plaintiff desired, for the improvement of the lands pur-
chased by him in Hidalgo county, Texas. The remainder
of the consideration due the land company was $24,776.50,
and was to be evidenced by the first vendor's lien notes
on the Texas lands described in the contract. The notes
were to be executed at the time of the delivery of the
deed, and were to run in installments of one, two and
three years from March 1, 1912, with interest at 6 per
cent. per annum, payable annually. It was further
agreed that, in event the liens against the land so deeded
by plaintiff and wife to Dan W. Gaines should exceed
the sum of $22,000, then, in that event, the excess above
such amount should be added to the vendor's lien notes.
Deeds were to be executed to Dan W. Gaines to be left
in escrow with the Standard Land Company and to be
delivered when abstract of title was brought down to
date. The purchase and sale was to be in full settlement
of all prior contracts executed between the parties
respecting the purchase and sale of Texas lands and the
land of plaintiff, and, in event the incumbrances of the
property of the plaintiff should be less than the $22,000,
then the difference should be deducted from the
vendor's lien notes to be secured on the Texas land.
Plaintiff, continuing his testimony, stated, in substance,
that he was curious to know how the water got on the
land in Texas, whether by reason of rains or from over-
flow from the river; that there was about four or five
inches of rain in that county the last of June, 1912,
and he could not tell how the water got on the land. The
record shows that Nutter did not pay the first of the
vendor's lien notes when it became due, and Langley

demanded payment and tendered a deed to Nutter for the lower lift lands.

On cross-examination plaintiff testified that he made his first trip to Texas on April 8, 1911; that he found the corn down there was just earing out and of good quality. Pictures were taken, which are attached to the record. He went to Texas the second time in July of the same year with his brother-in-law; they stayed two or three days. When he came home he got ready to go down there and put up cane for the defendant company. He made another trip in the fall of 1911 to put up cane for the company. His three boys went with him. The cane was located north of San Juan and was growing on land somewhat like the land he had purchased. The cane was of good quality. There is a picture in the record taken of the cane field where they were cutting. He stayed six weeks, and got acquainted with the people down there at that time. While down there on that trip, he had occasion to go south of San Juan about a half mile to cut a piece of cane. He came back and executed a memorandum contract on December 21, 1911. The contract was satisfactory to him then, and carried out his wishes the way it looked to him. He made another trip in March, 1912, to Texas, at the request of Mr. Langley. They showed him some pieces of alfalfa north of San Juan, some west of San Juan and south of McAllen. They were pretty fair. The purpose of the trip was to see whether alfalfa would grow. He was satisfied with it at that time. He went down again on June 4 of the same year. He made up his mind to make the contract before he went to Omaha. He concluded to go through with it or call the deal off. The last trip was made to Texas in March, before he bought the land. He went down there on June 10 to look at the land. He had not signed the vendor's lien notes then. He had been around there four or five times before this trip, and had been at liberty to go and come as he pleased. He knew what resacas were before May 20. He knew

what the first and second lift land was. He had more talk with Langley than with any one else. He asked Langley the day the contract was made whether the land was in or near lake Sardines. He wanted to look at it. He was not satisfied with what they told him and wanted to see it before he consummated the deal. The land that Mr. Kean showed him was all right. He did not know then that it overflowed. Mr. Butcher first interested him in Texas land. He read the government reports about soil and conditions down there before he went down and before he made the final contract. He left Texas and came back to Nebraska about December 18, 1912. He came back because his wife did not like the country. He would have stayed there and run his chances with the rest. He liked it when he first went down there and thought it a great country. His wife is the one who caused him to go down there. He saw water on the land several times during the summer. There was no water on the land when he went there with Mr. Kean on June 10. On June 22 he saw water there. There was a big rain after he got there, between June 10 and June 22. Mr. Kean pointed out the northwest corner as they came out of the basin. The resaca was on the north side. It appears from the testimony that a resaca, as described by a witness, is a depression like a ravine through which the water ran in times of rain. Mrs. Nutter, in a measure, corroborated the testimony of her husband. Nutter said he wanted to trade his Nebraska lands for the Texas lands. He thought he liked the country. He made one trip before April, 1912, and another again in June, 1912. He stayed in Texas from that time until August, and then returned to Nebraska and stayed until October 15, then started back to Texas and lived on the farm until December 18. He signed up the vendor's lien notes in July.

Mr. Frank, a witness for the plaintiff, testified that he was able to cross the resaca in March, 1914. There was no water there at that time. The resaca appears to

be a drainage course. He did not consider it productive. The resaca was only waste land. He had heard it said that the first lift was the most productive land in the valley for sugar cane. The land is level and in its wild state is covered with brush. This kind of growth is found on both the first and second bottom. It can be cleared readily. The soil is a dark sandy loam about 20 feet deep.

One Lucas testified as a witness for plaintiff that he was down in San Juan in 1912. He had been down "road 1" many times. There were two low places. There was water in both of them. They had a heavy six-inch rain down there in June, 1912. The resaca was dry the first time he went down there.

The plaintiff was recalled, and testified that he did not know at the present time what the market value of the land was on May 20, 1912; that he did not know what the actual value of the land was at that time. This is the substance of the plaintiff's testimony.

Witness Frank testified, in substance, that the depth of the soil on the second lift is 20 feet. He owns land there which he purchased in 1912, and raised corn, alfalfa and vegetables of the first class. The corn was raised on the edge of the first lift, and, in the opinion of the witness, would yield 80 bushels an acre, although he had heard it said it would go 100 bushels to the acre. The quality of the crop raised is of the best. Last year he raised 600 bushels of Bermuda onions on two acres. The water is good for domestic purposes. The country seems to be perfectly healthy. On cross-examination he testified that one field west of Parker raised 40 tons of cane an acre last year, which sold for $3.25 a ton. A man can raise 300 hampers of lettuce on an acre, and the market price for vegetables is good; the highest was $35 a ton for cabbage last winter, and the lowest $10 a ton.

Ralph R. Langley testified that he was the president of the Standard Land Company in 1912 and since that date; that Mr. Hawthorne had no interest in the com-

pany after he sold out, except that he agreed to go down on the next excursion. He bought his interest for himself and Mr. Gaines. He first met Mr. Nutter at San Juan in 1911. Mr. Nutter wanted to buy a good piece of land, but did not have the money. He wanted to sell some of his land in Nebraska, and would use the proceeds to buy Texas land. Witness wrote a contract with Nutter whereby the company had the privilege of selling 800 acres of his land. Witness knew nothing about the land. In event the company sold the land, he was to use the proceeds to buy Texas land. Nutter wanted to put in all of his lands in Nebraska and go down to Texas. Witness found that Nutter had listed the Nebraska lands at such high prices that they could not be sold. Nutter represented that the incumbrances were much smaller than they were; represented them as being only about half what they proved to be. They were past due, or about due. They found it would be necessary to pay about $40,000 in order to save the equity in Nutter's land, all of which was contrary to Mr. Nutter's representations. Nutter went to Texas in 1912 to put up sorghum for the company. He came to the office one day and said he wanted to rearrange his deal so he could have land on the first lift, for the reason that he thought it would grow better alfalfa than the second lift. He went down to Texas on that excursion and looked at 160 acres of alfalfa on the first bottom south of Mission. Langley stated that he did not encourage Nutter to buy any land; in fact, he tried to discourage him. He further stated that Nutter came to the office on May 20 and wanted to consummate his transaction right then, so he got Mr. Gaines to figure out some way that they could possibly make the deal. Langley made arrangements with Mr. Dan Gaines to put up the money that was necessary to pay Nutter's incumbrances and personal debts. Mr. Nutter desired to have first bottom land. Langley showed him a blue print which shows the contour and elevation

of the first bottom land, the only land he could sell him, which was 201.72 acres. Nutter said he would see it, and they entered into a contract with him. At that time it was impossible to determine the exact amount of his indebtedness, and hence the amount of his vendor's lien notes could not be determined. Nutter went to Texas, and Mr. Gaines paid his indebtedness, which was more than was expected. They found out the amount his notes would be, and sent them down to him to sign, and in the meantime he had examined the land which he had purchased. When the contract was made, Langley told him that he would execute his deed and retain it until he paid his first notes. There was an error in the amount of the land. It was called 210.72 acres, when in fact it was only 201.72 acres. When March 1, 1913, came, he did not pay his note. Langley paid all the incumbrances against his land, and tendered his deed to him and demanded payment for the note. Nutter put in a crop in a very poor manner and did not take care of it. They gave him $5,000, as required by the contract. He spent only a small portion of it on the land. In fact, he was paid more than that amount. They have always been willing and ready to deliver the deed to him, and had it ready to deliver and tendered it to him. Langley never made any representations whatever as to the character or quality or value of the land. Mr. Nutter had seen the valley before that time. The company had to raise more than $27,000 to pay the incumbrance on a portion of his land, and about $13,000 on another tract, and an additional incumbrance of $5,000 on 800 acres of it. Mr. Hawthorne had nothing whatever to do with making the contract. Mr. Nutter said that he wanted to divide his land, half of it on the second bottom and half of it on the first bottom. He was familiar with the first bottom and the second bottom land, and knew the difference. He said he considered the first better than the second bottom land. Langley made no representations to him about it. Parts of the

first bottom land will overflow at times. Langley only knew of its overflowing one time before Mr. Nutter made this contract, and had told him about it before. Langley attempted not to take his land because he did not want that "white elephant in Nebraska" on his hands. It was incumbered for more than its normal value, and the incumbrances were past due and subject to foreclosure. It took a large amount of money to pay them, and they did not have it. The fair market price of Texas land was from $150 to $165 an acre. They could sell it very easily, and did sell all of the adjoining lands, at these prices, and later on it sold for more money. They sold 10,000 acres in that vicinity at those prices during 1911, 1912, and 1913, not an acre for less than $150, and later on as high as $250 and $300 an acre. This included first bottom lands. Defendant Hawthorne did not sign the contract.

Eugene R. Kean testified for defendants that he resided in Edinburg, Texas; was manager of the Valley Reservoir & Canal Company; that he had worked for the Standard Land Company from May, 1911, to July, 1913, as local manager at San Juan, Texas; was acquainted with Mr. Nutter; had known him practically all his life. He had some business relations with him in Texas for the Standard Land Company, and made a contract with him to put up sorghum cane. Kean, at Nutter's request, took him in the summer of 1912 to look at lots 8, 9, 10, 12 and 13, in block 14, south of San Juan. He did not show him lots in block 15. He went with Mr. Nutter and wife to show them the lands they said they bought from the Standard Land Company; went to the northwest corner of lot 10, block 14. After leaving the northwest corner of the lot, they drove east on the north side of lot 10, where there was a road. The resaca runs along the south side of the road. He took them down to the edge of the resaca, approximately 1,000 feet. He knew nothing about the contract between Nutter and the company. The division of lots 10 and

11 is a little to the south of the center of the resaca. The northwest corner of lot 10 is covered with water a portion of the time. It had water on it at the time he showed it to the Nutters. He pointed out the resaca as a part of their land.

H. P. Griffin, a civil engineer, testified for the defendants that he was familiar with the resaca and the vicinity of San Juan; that the lands along the resaca were usually the best drained lands; that the first lift lands in the resaca were good agricultural lands, and would raise corn, cotton, cane, alfalfa, frijoles, onions, cabbage, potatoes, lettuce and beans; that the yield of sugar cane was from 40 to 60 tons an acre.

There was much testimony of other witnesses, but none of it relates materially to the questions involved in this suit.

The evidence shows conclusively that the plaintiff was indebted in a large amount, which was secured by liens upon the lands in Nebraska. Foreclosures were about to be commenced against him. He was very anxious to exchange his equities for the land in Texas. He had made several trips to that country; had worked there for the defendant company near the land in question in harvesting its cane, and had a general knowledge of the country. He deferred the execution of his vendor's lien notes until he made further examination of the land to be conveyed to him. Finally, after such examination as satisfied him, he executed the notes. It therefore may be said to be somewhat doubtful if the evidence is sufficient to authorize a recovery. However, the jury determined that question in his favor, and on this appeal, if their verdict could in other respects be sustained, would be conclusive on that point. It seems clear from the evidence that the verdict was excessive. The amount of land covered by the resaca was about 35 acres, and the remainder of it was substantially as represented. Allowing plaintiff $150 an acre for the 35 acres of waste land and $1,350 for the 9 acres of shortage, he would

not, at most, be entitled to recover more than $6,600. Therefore the verdict for $18,806.79 cannot be sustained. This obviates the necessity of passing on the other questions presented by the record.

On the question of the market value of the Texas land, it may be said that the contract was for an exchange of lands, in which each party fixed a trading value on his land, and they should be bound thereby. The evidence clearly shows that the defendant company tendered plaintiff a deed for 201.72 acres of the land in question, and is ready to convey it to him.

We therefore hold that, unless the plaintiff files a remittitur of all the judgment except $6,600 within 30 days, the cause will be reversed and a new trial awarded; but, if such remittitur is filed, a judgment for the above amount, with interest thereon from the date when it was rendered in the district court, will be affirmed.

JUDGMENT ACCORDINGLY.

SEDGWICK, J., concurs in the conclusion.

FAWCETT, J. The evidence does not sustain a recovery. The judgment should be reversed and the action dismissed.