No. 29,103.

ADAM YAGEL, *Appellant*, v. THE KANSAS GAS & ELECTRIC COM-
PANY, *Appellee*.

(291 Pac. 768.)

Opinion
filed October 11, 1930.

*Charles H. Cory* and *Payne H. Ratner,* both of Parsons, for the appellant
*Paul H. Kimball, Webster W. Kimball,* both of Parsons, *H. L. McCune*
and *Lynn Webb,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal from a judgment on a condemnation award for subjecting forty acres of plaintiff's farm to the servitude of a right of way for the high-tension wires of a power company, and for sites for two steel towers to carry the wires east and west across the property. The farm consists of the south eighty acres and the northeast forty acres of a quarter section of land in Labette county (S½, NE¼ and NE¼ of NE¼, 2-32-21 east). The south eighty contains the farmhouse, barn and outbuildings, and about twenty-three acres of open land. The rest of the eighty is covered with timber. A creek and some growing timber separate the eastern part of the south eighty, where the improvements are located, from the rest of it, and also from most of the northeast forty over which the defendant's power wires are strung and on which the two steel towers are erected. That forty contains about thirty acres of open land. The rest is covered with growing timber. The forty lies in the Neosho river bottom and is subject to overflow. On this forty acres are the two steel towers, 85 feet high and 16 feet square at their bases. Steel crossbars 12 feet wide are fastened to these towers at a height of 63 feet from the ground, and on these the cables of the transmission line are strung. The east tower is located near the east line of the forty and the west tower 733 feet west and slightly north of the other. To give free access to the power lines and towers, a strip of land 100 feet wide across the forty was condemned; but aside from the restriction not to erect buildings or stack crops thereon, the plaintiff owner of the servient estate is free to graze, farm or otherwise use the condemned right of way as he may choose. The evidence and the photographs submitted for our consideration make it plain that for all practical purposes the condemnation only deprives plaintiff of the actual use of two spots of ground 16 feet square, upon which the steel towers are erected, and subjects his land to defendant's right to go upon it to inspect its wires and towers and to make needful repairs.

Some witnesses for plaintiff testified that before the condemnation the land was worth $50 per acre and the damage thereto by the condemnation amounted to $10 or $15 per acre. Some witnesses even thought that this damage would adversely affect not alone the value of the forty acres but the entire farm to that extent. Other witnesses, however, testified that the forty subjected to the con-

demnation was worth not more than $25 per acre and the south eighty from $25 to $38 per acre, and that the condemnation for the power lines did not affect the value of the south eighty in any degree. Some witnesses testified that $100 to $200 would compensate plaintiff adequately for the property condemned. One witness familiar with plaintiff's farm, who had assessed it several times for taxation, testified:

"Yagel's farm was worth $25 an acre before the transmission line was built across it, including the improvements and everything on it; value of the land about $200 less after the lines were built across it; . . . don't think building the line across the north forty affected the value of the south eighty.

"Am acquainted with the soil on the Yagel farm; the south upland is rather a. gravel; going west it is what we call sour oak land; a swampy piece of ground. The piece that the [power] line passes over is a sour water oak; a kind of black gumbo that is hard to cultivate; if you don't plow in the right kind of season you can't get it in shape for a crop at all. That particular soil has a tendency to crack open in dry weather. . . .

"The river overflowed in 1923 and 1924, then it missed overflowing and it has overflowed since. Last year it overflowed seven times, and three times up until this time this year. This year all the low ground has been under water, including the Yagel farm."

The jury answered a number of special questions showing by items how they reached their award of $200 for the property subjected to condemnation and damage to the property not taken—the 100-foot right of way across the forty acres amounting to 3.24 acres, $81; inconvenience to plaintiff in not being able to stack crops on the 100-foot strip, $19; inconvenience in cultivating the land due to the presence of the two tower footings 16 feet square, $100. The jury specifically rejected any items of award on account of plaintiff being inhibited from erecting buildings or other improvements on the 100-foot right of way, for unsightliness of the transmission line across the land, for injury to crops, trees and fences, present or future, for interference with telephone and radio. Other items of claimed damage were disposed of thus:

"(i) Possibility of injury to life or property by wires breaking? A. Nothing.
"(j) Possibility of injury to children by their climbing up the towers and coming in contact with the high-tension wires? A. Nothing.
"(k) Possibility of the growth of noxious weeds? A. Nothing.
"(l) Possibility of danger to life or property from lightning? A. Nothing."

Plaintiff's motion for a new trial was overruled, judgment was entered in accordance with the verdict and special findings, and plaintiff appeals.

Error is assigned on the trial court's refusal to instruct the jury that in determining the amount of damage to plaintiff's farm by the presence of defendant's transmission line on the northeast forty the jury should take into consideration—

"The facts and circumstances, if any, showing that his said farm has been made less valuable because of fear in the minds of prospective purchasers of injury to persons or property, if any is likely, from breakage or falling of the high-power wires, if this depreciates the value of the property."

Counsel for plaintiff cite cases wherein it was held that the element of fear of falling wires might be a proper element of damage to land subjected to a servitude for a transmission line. One of the cited cases was *Power Co. v. Bruneau*, 41 Utah 4, in which it was held that in computing a proper award for land taken for a right of way for the electric wire of a power company it would be proper to consider the injury to the market value of the land not taken because of the danger to persons, stock or crops from the possible breaking or falling of the wires or other parts of the transmission line, but no competent evidence on that point was offered in that case; nor was there any competent evidence on that subject in the case we have to consider. Moreover, the Utah case arose about twenty years ago when electric transmission lines were neither as well known nor as efficient as now. In the Utah case the power lines were supported on cedar poles, the wires were suspended 23 or 24 feet above ground, they carried a current of 44,000 volts, and an electrical engineer testified that persons and animals on the ground within 10 feet of the wires would be exposed to danger. In the present case the wires are carried on steel towers 85 feet high, each tower having four footings set in the ground on the points of a 16-foot square, and attached to anchors made of open-hearth steel, for each of which a hole is bored in the ground and a charge of dynamite is placed sufficient to give an expansion of 30 inches. The anchors are then set in the earth and encased in concrete. By engineering calculations, which were not challenged, defendant's towers were shown to have a large margin of strength above the heaviest tests anticipated from ice-loading and wind velocity, and it was also shown that if a tornado should overthrow the towers or break the wires the electric current would be automatically cut off and the grounded wires rendered harmless. In the Utah case the transmission wires were suspended 24 feet from the ground. In the case before us they are supported by insulated steel crossbars 63 feet above ground. On the matter of fear of injury to persons

or property by the breakage or falling of the high-power wires, in the minds of prospective purchasers of the farm, which would depreciate the selling value of the farm, it was shown that on each of the towers was a sign which read: "Danger, Danger, High Voltage, Keep Out. Kansas Gas & Electric Company."

Plaintiff testified:

"I couldn't say how much the damage decreased the value of the land. . . .

[COUNSEL FOR PLAINTIFF]: "Q. Have you considered that as a danger of the wires burning in two from a lightning storm, if there was a lightning storm, and swinging around them and getting you anyhow? A. We can't get away from that feeling; that is our understanding of it; maybe we are just ignorant.

"Q. Well, what I am getting at, have you considered the fear of lightning and that sort of thing, as one of the elements that depreciates the market value of your property? A. I think it would depreciate the salability of it, the buyer would have the same feeling and want to get away from it.

"I don't know how much of the decrease in value I have allowed for that proposition.

[COUNSEL FOR DEFENDANT]: "I don't want to clutter up this record, but I move now again to strike out all his testimony about the decrease of market value because of the consideration of these elements among others.

"BY THE COURT: Overruled. There is no way of getting at it, in the way you present your questions. A motion to strike don't bring out anything in particular. Some of that may be properly stricken, but the only thing I can say in reference to that is, the court will instruct the jury on what are proper elements and what are not proper elements of damage. And if this witness says he considers, or has taken into consideration as the elements of damage, things that are not proper to be taken into consideration under the law as elements of damage, the court, of course, will so instruct the jury."

No evidence more tangible or pertinent in the matter of fear as affecting the market value of the farm was offered, and the trial court instructed as follows:

"In estimating the compensation, or award of damages, to plaintiff, if any, you may take into consideration every legitimate use to which the land may be applied and for which it is adapted and everything that affects the value of the land, . . .

"The measure of damages for the land appropriated by the said condemnation is the difference between the fair market value of plaintiff's land affected thereby immediately before the appropriation and its fair market value immediately after such appropriation, taking into consideration the manner in which the transmission line is actually constructed and located thereon, irrespective of any benefit to the premises from said transmission line. . . . The market value is the fair value of property as between one who wants to purchase and one who wants to sell.

"In making such estimate of damages, you should allow the fair market value of the land actually covered by each tower; the difference in market

value of the strip of land 100 feet wide, appropriated to defendant's use in the way and manner and limitations, as described and provided by the report of the commissioners, to which your attention has been directed, approximately 3.24 acres. . . . the depreciation, if any, in the market value of the residue, . . .

"Damages which lessen the value of the residue of the land, the land not appropriated by condemnation, if any, may be by you considered in the ascertainment of damages, which should be equal to the diminution in market value for any use for which it may be reasonably adapted; but such damages must be real, imminent and reasonably to be apprehended; and not remote, speculative or merely possible. Such damages, if any, as will naturally result from the appropriation of the right of way, or might reasonably be expected to result therefrom. . . .

"The fear of a remote and contingent injury which may possibly occur because of the condemning and appropriation of a right of way across the land of plaintiff by the right of eminent domain herein exercised by defendant, and the maintenance of its transmission line thereon, the happening of which is remote, speculative and uncertain and merely possible, including accidents, action of the elements and acts of God over which defendant has no control, cannot form the basis for allowance of damages in this case, and should not be considered by you in determining the amount of your award."

These instructions were in accord with the very cases cited by appellant. Even in the Utah case, *supra*, the supreme court approved an instruction to the jury which stated the law thus:

"You are instructed that you should not consider in the assessment of damages such remote contingencies as danger to persons or stock or crops from the possible breaking or falling of the wires or other parts of plaintiff's transmission line, . . . unless upon consideration of the evidence you find by the preponderance thereof that that will injure the market value of the land." (p. 11.)

In *Kentucky Hydro-Electric Co. v. Woodard*, 216 Ky. 618, the court rejected ill-defined and speculative fear of electric transmission lines as an element to measure damage to market value of land, adding:

"But if such fears be reasonable, not ill-defined but founded on practical experience, and if they be entertained so generally as to enter into the calculations of all who propose to buy or sell, can it logically be said that they do not depreciate the market value of the property? The property owner is to be paid for his actual damage. If he cannot sell his property at as good a figure with this line on it as he could without it by reason of reasonable fears, not speculative, but founded on experience, and entertained by those who wish to buy, has he not been damaged in this regard? It is no fault of his that the line has been erected. Under such assumed state of facts, his land has been depreciated on account of such fear on the part of buyers." (p. 631.)

Commenting on the evidence on this point, the Kentucky supreme court said:

"When cross-examined, however, appellees' witnesses admitted that their estimation of the damages was in large measure based on the fear the witness' had of possible danger to persons arising out of the construction and maintenance of the line. They did not show that this fear was founded on experience, or was reasonable, or was based on the knowledge of how these lines were constructed and maintained, as we have seen above is essential to cause diminution in value brought about by apprehension of danger to be a factor to be considered by the jury in awarding compensation. Such fear as these witnesses testified about was that ill-defined, speculative and unreasonable fear which we condemned. Further, these witnesses did not show that this fear, had it been of the proper kind, was so broad that it affected the market value of the property. They testified only that, in their judgment, the land was depreciated in value because of the fear such witnesses entertained. Woodard testified that nine-tenths of his estimate of resulting damages of $30,000 were attributable to the fear he entertained of danger to himself and family arising out of the construction and maintenance of the line. He showed no reasonable basis for such fear nor that such fear affected the market value of his property. . . . But in the light of the testimony in this record which shows that the large estimates of damage given by appellees' witnesses were based almost, if not entirely, on the element of fear not allowable, and . . . with that element eliminated, as it should have been, the verdict of $8,500 cannot stand." (pp. 635, 636.)

In *Appalachian Pr. Co. v. Johnson*, 137 Va. 12, the court declared that if competent evidence had been presented the condemnation commissioners could properly have taken into consideration the effect of the fear of the transmission line breaking down and injuring persons and property—

"Whether due to inherent defects or unavoidable accidents, not to be guarded against by reasonably skillful construction and careful operation (*Alloway v. Nashville,* supra, 88 Tenn. 510, 13 S. W. 123, 8 L. R. A. 123); or perhaps, indeed, even where due to negligent construction or operation, if the liability to such injury in fact depreciated the market value of the property. 2 Lewis on Em. Dom., sec. 740 (497); and *Leroy, etc., R. Co. v. Ross,* 40 Kan. 598, 20 Pac. 197, 2 L. R. A. 217, and note." (p. 31.)

The pertinent matter in the Kansas case cited by the learned Virginia court reads:

"Where a railroad is laid through a farm or tract of land used for stock purposes, or adapted to stock purposes, the accidental danger to which stock thereon will be exposed may be considered in giving compensation to the landowner for the right of way appropriated for the railroad, so far as the same affects the value or depreciation of the farm or tract of land. . . . And in the absence of any evidence showing that the farm or tract of land

has stock therein, or is adapted to stock purposes, an instruction to consider the increased risk, or the probability of stock upon the premises being accidentally killed or injured in the operation of the railroad, is misleading and erroneous.

"When a part of a farm or tract of land is appropriated for the right of way of a railroad, danger from fire to building, fences, timber or crops upon the remainder, in so far as it depreciates the value of the property, may be properly considered in giving compensation to the landowner; but as tending to show the depreciation in the value of the property by reason of the danger from fire, all the facts in regard to the situation of the property and improvements relative to the railroad should be introduced in evidence. . . . And in the absence of all evidence tending to show any depreciation in the value of the property by reason of such danger, an instruction to the jury to consider accidental danger from fire to the premises, resulting from the operation of the road, will be misleading and erroneous." (*L. & W. Rld. Co. v. Ross,* 40 Kan. 598, syl. ¶¶ 4, 5, 20 Pac. 197.)

On the other hand, the weight of authority clearly holds that the mere fears of people arising from the proximity of an electrical transmission line are not a proper element on which to calculate a depreciation in the market value of land. The supreme court of Alabama went into this question quite thoroughly in *Alabama Power Co. v. Keystone Lime Co.,* 191 Ala. 58, a case on all fours with the one before us, and held—

"Where a right of way for the erection or maintenance of towers, poles and wires for the transmission of electricity is condemned, the owner may recover compensation for the actual damages arising from depreciation in the value of his remaining land, caused by the presence of these things upon the right of way; but mere fears of people from their presence upon the right of way cannot be made a basis on which to predicate such depreciation or affect the amount of the recovery." (Syl. ¶ 2.)

In the opinion it was said:

". . . The damages resulting to the owner of the lands not condemned— the lands out of which the right of way is carved—are the difference in its actual fair value before and after the condemnation. In estimating the amount of such resultant damages, the jury should consider only such injuries as will naturally result from the appropriation of the right of way for the permanent uses for which it was condemned, and 'only such injuries as are ascertainable at the time of the construction of the improvement should be considered.' (*Young v. Harrison,* 17 Ga. 30; *Chicago, etc., R. R. Co. v. Hunter,* 128 Ind. 213, 27 N. E. 477; 15 Cyc. 715, subd. B, and authorities collated in notes 74 and 75.) The resultant damages must be the direct and certain— not remote and speculative—damages which will accrue to the remaining lands by reason of the presence of the right of way through such lands, and the uses to which such right of way is to be put. . . .

". . . Is the tract of land—leaving out of consideration the value of the

100-foot strip—of appellee of any less actual value since the towers and telephone poles have been placed upon the 100-foot strip, with the cables upon the towers and telephone wires upon the poles, than it was before the towers and poles were erected upon the strip and the cables and telephone wires placed as they are now hung above the earth? . . .

". . . These cables are, however, attached to steel towers, and are 25 feet above the ground at their lowest points on the right of way. They are, therefore, too far removed from the earth to be attended with danger to human beings so long as they use the surface of the ground in the ordinary and customary way, viz., by cultivating it, walking or riding upon it, or by hauling loads in wagons or other vehicles upon it. We not only think that the evidence discloses the above situation, but we think that human experience indicates it. Electricity not properly controlled is one of the most dangerous agencies known to man; properly controlled, it is not only of great practical value, but its use, under proper control, is attendant with as few dangers to life as any other agency which human ingenuity has been able to place at our disposal. It would seem, therefore, that the mere fact that the appellant has strung across appellee's land, as above indicated, cables which are heavily charged with electricity at the lowest point of 25 feet from the surface of the earth, and which cables, if breakage occurs, will automatically become instantly innocuous, can have no bearing upon the question as to the loss which appellee has suffered in the adjacent lands through which the right of way runs by reason of the condemnation of the strip of land. The mere fact that people have fears that injury may possibly occur at some time to some person by reason of the cables cannot be considered by the triers of the facts. . . . For this reason the rule seems to be well settled that: In all condemnation proceedings, 'the exercise of the power being necessary for the public good, and all property being held subject to its exercise when and as the public good requires it, it would be unjust to the public that it should be required to pay to the owner more than a fair indemnity for the loss he sustains by the appropriation of his property for the general good.'" (pp. 65, 66, 68.)

For the proper elements and measure of compensation for private property subjected to condemnation for the use of electric power lines and for damages to the remaining land, see note to *Illinois Power and Light Corp. v. Peterson*, 322 Ill. 342, in 49 A. L. R. 692, 697. In that note, page 702, analogous cases are cited where damages on account of fear of falling wires have been disapproved.

In the case at bar the instructions of the trial court set out above correctly stated the pertinent law governing the measure of damages for the land taken by the condemnation proceedings, and also the correct measure of damages to plaintiff's remaining land not taken, and the error based upon the trial court's refusal to give the requested instruction cannot be sustained.

Complaint is also made of the trial court's rejection of the testi-

mony of a witness which would have shown that defendant paid $75 per acre for forty acres near plaintiff's farm. But other witnesses did·testify to that effect. The circumstances, however, were not inquired into, apparently for the reason that evidence of the price paid for a particular neighboring property in a specific or exceptional sale does not prove the general market value of land in that vicinity. (*Railway Co. v. Weidenmann*, 77 Kan. 300, 94 Pac. 146; 22 C. J. 760, 761.)

Error is also urged on the rejection of evidence tending to show the cost of clearing off the timber on similar lands adjacent to plaintiff's farm. It is not conceivable how such evidence could have had any practical or helpful bearing on the matter at issue.·

There is nothing further in this case requiring consideration unless it be to note the viewpoint of counsel for appellant which, if we understand it, seems to be that ordinary principles of law do not necessarily apply where a legal controversy arises between a farmer and a corporation like the defendant. They say:

"If farmers cannot have this element [of fear] considered in cases of this kind their farms will be subject to practical confiscation without compensation and the provisions of our constitution in this regard will be thus nullified."

In *Alabama Power Co. v. Keystone Lime Company,* supra, the court made it plain that it is for the public interest and not for the private benefit of the stockholders of a public service corporation that the right to condemn a farmer's property is granted. The court said:

"While public service corporations are permitted to exercise the right of eminent domain, and thus acquire against even an unwilling owner valuable rights in his land, it is the public interest, and not the private right of the public service corporation or its stockholders, which confers upon such corporation the right of eminent domain. . . . In every instance it is the public right, and not the private interest, which gives rise to the extraordinary right of eminent domain. . . . While, therefore, it is the intent of the law that all the actual damages which may naturally and proximately result to the remainder of a man's tract of land by reason of the condemnation of a right of way for a public purpose across it shall be paid to him, the law will not permit mere speculative elements of damages, based upon an ill-defined fear that at some unknown and indefinite time in the future some misfortune may come to some man or beast by reason of such improvement, to enter into the consideration of those who, under the law, are required to fix the amount of the damages." (pp. 67, 68.)

The judgment is affirmed.