CHARLES E. PEARSE ET AL., TRUSTEES, ET AL., APPELLEES, V. LOUP RIVER PUBLIC POWER DISTRICT, APPELLANT.

290 N. W. 474

FILED MARCH 1, 1940. No. 30734.

*August Wagner, C. N. McElfresh* and *Webb Rice,* for appellant.

*Moyer & Moyer* and *Mapes & Mapes, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

PAINE, J.

This is an appeal by the Loup River Public Power District from judgment on a verdict against it for $1,883 for a right of way and perpetual easement for an electric power transmission line across a farm of 240 acres.

The Public Power District, hereafter called the condemner, began proceedings in the county court for Madison county to acquire a right of way by condemnation under the power of eminent domain. Appraisers were appointed, who returned an award of $750, from which award the condemner appealed to the district court on the ground the award was excessive.

A stipulation was entered into between the parties that damages in the future to growing crops would be paid if and when they arose, and were not to be compensated for in these proceedings.

In the trial in the district court the plaintiff proceeded on the theory that the award was wholly inadequate.

The evidence discloses that the 240-acre farm lies 4½ miles east of the city of Madison, and that every acre is tillable. It is fenced and cross-fenced, and the buildings . consist of a large modern house, a horse barn for 25 head of horses, a cattle barn, hog sheds, feed lots, silo, granaries, chicken house, farrowing pens, grain elevator, with a capacity of 5,000 to 6,000 bushels, hollow tile corncrib with a capacity of 4,500 to 5,000 bushels of corn, a complete water system throughout the yards and feed lots. The farm is adapted to raising and feeding live stock, and the land, of loess soil, is best for raising corn, alfalfa, and small grain. Because of a scientific plan for rotation of crops, pursued for years, the yield is above the average, as the farm has in the past produced crops of 60 bushels of corn per acre, 80 to 90 bushels of oats, and unusually fine crops of alfalfa. A graveled road connects the farm with Madison, and it is considered one of the best farms in the county. Many wit-

nesses testified that this farm was worth $90 to $100 an acre, and the condemner in his brief admits that $85 an acre is a fair valuation.

The transmission line crosses the farm on a straight north and south line close to the east side of the farm, and consists of three cables suspended from cross-arms supported by two poles. These poles are 50 feet long, set seven feet in the ground, and are creosoted, and the life of the poles is from 30 to 40 years. Each of the six supporting structures across this farm are the same. Two poles are set 14 feet six inches apart, and the east pole of each of the six pairs is set from 12 to 15 feet inside the east boundary line fence of the farm, and the poles are X-braced to give them strength and resistance to high winds. Each of the three electric cables, or conductors, are made with a core of seven strands of steel galvanized wire, around which are wound a number of strands of aluminum wire, which carries the current. The life of a conductor of that sort is indefinite. Similar conductors after having been in service for 20 years show no evidence of deterioration.

D. J. DeBoer, chief electrical engineer of the condemner, testified that he did not know of a single case where this kind and size of a cable was broken, but if a break should occur the line would be de-energized the instant that the cable hit the ground, as automatic circuit breakers immediately take the line out of service the instant it hits the ground, that is, the line would be absolutely dead in a little over one-tenth of a second.

The lowest point which the cables hang to the earth at 60 degrees F. is 28 feet in four of the spans, 29 feet in another, and 35 in another; the distance to the ground would be reduced about six inches for each ten degrees rise of temperature as the cables expand. These clearances equal or exceed those required by the National Safety Code when a power line goes over highways. The weight of the cables is one-half pound per foot, or from 275 to 300 pounds per span.

This power line is designed to carry from 69,000 to

115,000 volts of electricity. Electricity of this voltage will arc or jump from this uninsulated cable to another well-grounded object a distance of between five and six inches. These lines are patrolled or inspected by men on foot, and it is testified that a major repair, such as replacing a cross-arm or pole, which would require going upon the farm property with a repair truck, would not be required more often than once every 15 years. Each pole is equipped with a ground wire extending from the top of the pole to the ground to carry off lightning, but there is no danger in coming in contact with the poles, or with these ground wires, except during a lightning storm. There is a large steel tower in this line one mile north of this farm which affords added protection from lightning, and it is testified that the presence of these six structures on this farm tends to reduce danger from lightning strokes to live stock and fences. The residence and farm buildings are located from 400 to 500 feet from the transmission line.

Several witnesses for the condemner testified that the market value of the farm would not be decreased more than $150 to $200, and a county supervisor from Platte county testified that he had two such transmission lines across his farm, that he had personally farmed around such structures for a period of nine years, and that the diminution of market value by reason of the building of the transmission line would not in his opinion exceed $15 to $20 for each structure.

Robert Fulton, an electrical engineer, of Lincoln, was the expert called by the plaintiff. He was 51 years of age, a graduate of the college of engineering of the University of Nebraska, has been consulting engineer in the installation of many municipal electric systems in the state, and from 1934 to 1937 was chief electrical engineer for the Platte Valley Public Power & Irrigation District, and since that time has been in the employ of several electrical districts. He testified that he is familiar with the transmission line extending from near Columbus to Norfolk, Nebraska; that it is insulated for 69,000 volts, and all of the balance of

the construction is suited for 115,000 volts; that any person would be safe within 15 feet of the wires, and that a person thoroughly familiar with such transmission lines could approach much closer without danger; that it is dangerous for an ordinary person to approach nearer than 15 feet to the actual conductor, therefore a farmer should not start a stack of hay within 50 feet of such conductors; that in working on haymaking tools, binders, or combines, where the clearance is 27 feet, he would be in danger if standing on the top of a combine which would put him 17 or 18 feet in the air. Another danger mentioned was that children should not fly kites near these conductors.

A number of farmers were called by the plaintiff, who testified as to the increased difficulty in farming the land. One testified that grain could not be cut along the fence line between the posts and the fence with an eight-foot binder; that in checkrowing corn one would have to cut the wire north and south and resplice it 12 times in the field where the poles stand; that the weeds would grow up around the poles, and that these could not be mowed with a tractor or horse-mower, but would have to be mowed by hand, and that it would be necessary to cut these weeds at least three times during the crop season.

Another responsible farmer, who had been county commissioner of Madison county for 12 years, testified there would be difficulty in farming the narrow strip of land between the pole lines and the fence in cutting grain, in discing, and in harrowing, and that the presence of this power line would make a difference to him of $15 an acre on the entire farm, or damage the farm $3,600.

The evidence of one real estate agent was that the power line decreased the value of the entire farm from $5 to $10 an acre, and another that it decreased it from $12.50 to $15 an acre.

This is perhaps an inadequate abridgement of the several hundred pages of evidence in the bill of exceptions, but gives the great variance of the testimony before the jury, which ran from a damage of $12 to $15 a structure for the

six structures up to the same amount per acre for the entire farm, and on this evidence the jury returned a verdict of $1,883.

The condemner sets out 18 assignments of error for the reversal of this judgment, charging that the verdict is excessive, that the jury entirely disregarded the important fact that the transmission line is limited to about three acres of land along the edge of the east line of the appellee's farm, and in no manner interferes with the use of the remaining 237 acres, or casts any burden thereon, and that the testimony of competent witnesses that the market value of the remainder of the tract was in no manner decreased was entirely disregarded by the jury.

Objection is made to the receipt of certain evidence, over the objections of condemner, about children flying kites, and stacking hay near the line. Condemner also objects to the giving of instructions Nos. 9, 11 and 12.

The condemner offered just one instruction, which was refused by the trial court, reading as follows: "In assessing plaintiffs' damages, you will allow them such damages as you find from a preponderance of the evidence they have sustained in depreciation, if any, of the fair market value of their farm. Such depreciation is to be measured by the difference in the fair market value of the farm immediately before the construction of the transmission line thereon and immediately thereafter. Your finding must be based upon the evidence and not upon conjecture. In weighing the evidence relating to such depreciation you may consider every element of annoyance, disadvantage, and danger resulting from the improvement, which would influence an intending purchaser's estimate of the market value of the farm, if any such are proved by the evidence, but you are not at liberty to consider speculative, imaginary, or fanciful disadvantages, or consequences which the owners themselves might avoid by the exercise of reasonable care. Nor are we here concerned with damages that possibly may arise in the future from negligence of the District in the construction or maintenance of its line, as such damages would

be recoverable by the party injured in a separate action, if and when they arise, and you will not consider such speculative damages in making up your verdict in this case. All damages to which plaintiffs are entitled in this action are measured by the depreciation in the fair market value of their land, and resulting from the proper construction and maintenance of the improvement. When you have so assessed their damages, you will have allowed them full compensation in this case."

It is argued rightly that it is error to refuse a proffered instruction which is warranted by the evidence and correctly states the law of the case, unless the principles involved are covered by other instructions. *Hyndshaw v. Mills,* 108 Neb. 250, 187 N. W. 780; *First Nat. Bank v. Carson,* 30 Neb. 104, 46 N. W. 276.

An examination of the instructions given by the trial court discloses that the subject of the measure of damages was covered by the court's three instructions Nos. 10, 11 and 12; that these three instructions were, as claimed by condemner, three times as long as the one instruction above set out. However, each element set out in the above instruction was covered by the court's three instructions, and some of the principles were simplified and others were amplified so that the jury would clearly understand each principle of law.

There is undoubtedly merit, as a rule, in giving short instructions, but if any elaboration is to be allowed in the charge to the jury it would be overlooked in the instructions dealing with the measure of damages to be allowed, for this subject is often troublesome to the members of a jury while deliberating.

We can admit that the instruction tendered is a fair and concise statement of the law on the measure of damages, and yet hold that the trial court covered the subject completely, and with perhaps greater clarity. We conclude that the court's charge to the jury was correct, and did not tend to confuse the jury.

In the brief of the condemner, it is set out that three

projects in Nebraska are being federally financed by the Public Works Administration, designed to eventually produce 500,000,000 K. W. H. of electric current annually, and "to get this power to the farms and to make it available for industries, it must be sent out to Norfolk, Scottsbluff, Hastings, Grand Island, Kearney, Beatrice, South Sioux City, to Lincoln and Omaha, and to a hundred other communities in the commonwealth. It is necessary to construct transmission lines to do this. These transmission lines must cross farm lands. If unreasonable, exorbitant and excessive allowances must be made for right of way easements, the success of the entire development which includes irrigation for thousands of acres of productive lands may be aborted. Costs of the projects have already greatly overrun estimates. * * * This is not to suggest that to speed our material development, private property should be taken without just compensation. But is to suggest that proper regard should be had for the obverse side of the shield, to the end that public funds be not taken for private remuneration except upon full value received."

The plaintiffs' farmer witnesses, as well as reliable real estate agents, have testified that the land was worth from $5 to $15 an acre less upon the whole tract than it was before the line was built. In *Dunlap v. Loup River Public Power District*, 136 Neb. 11, 284 N. W. 742, 124 A. L. R. 400, this court said it was proper to consider the reasonable market value of a farm before and after such power line is built across it, and, if an owner cannot sell his farm at as good a figure with this line across it as before, that this was proper to consider. See *Kentucky Hydro-Electric Co. v. Woodard*, 216 Ky. 618, 287 S. W. 985; *Kentucky Hydro-Electric Co. v. Reister*, 216 Ky. 303, 287 S. W. 357; annotation, 49 A. L. R. 697; *Lilienthal v. Platte Valley Public Power and Irrigation District*, 134 Neb. 281, 278 N. W. 492; *Asche v. Loup River Public Power District*, 136 Neb. 601, 287 N. W. 64; annotation, 124 A. L. R. 407.

There is no question but what it will be difficult for repair trucks to get through the cultivated fields to this line.

The plaintiff testified that there was only one gate which gave access to the fields, and from that, one would go north through the yard, around the residence, and to a lane east of the feed lots, and turn east across the fields to that line.

So far as the amount of the verdict returned in this case by the jury is concerned, it cannot be set aside and disregarded as being arrived at through passion and prejudice, for the verdict is well within the testimony returned by several of the witnesses.

However, in the opinion of the court, the verdict is much too high, for the plaintiffs retain all of their land except the few square feet of ground occupied by the 12 poles making up the six structures. They may cultivate their land as before, so far as these 12 poles do not interfere. There will be abundant room for alfalfa stacks, even if none can be placed within 50 feet of these three transmission lines. If there is difficulty in planting checkrowed corn along this narrow strip of land along the east fence occupied by these six structures, perhaps other crops can be planted on this ground with much less annoyance and trouble.

The rule of this court has been that, on appeal in an action for damages, a judgment on a verdict which the clear preponderance of the evidence shows to be excessive may be reversed unless appellee files a remittitur for the excess. *Corr v. City of Omaha,* 122 Neb. 323, 240 N. W. 312, in which a remittitur was ordered of $3,000.

In *Nutter v. Standard Land Co.,* 100 Neb. 548, 160 N. W. 948, the jury rendered a verdict of over $16,806.79, and a remittitur was ordered of all above $6,600. In *Sternberger v. Sanitary District,* 100 Neb. 449, 160 N. W. 740, the jury returned a verdict of $1,585.15, and it was directed that all of the judgment above $500 should be remitted.

In *Wiles v. Department of Public Works,* 120 Neb. 689, 234 N. W. 918, a verdict returned in the amount of $9,000 was affirmed after a remittitur was filed in the amount of $3,000. In *McGinley v. Platte Valley Public Power and Irrigation District,* 133 Neb. 420, 275 N. W. 593, a verdict and judgment of $23,813.70 was by remittitur reduced to

$17,000 without the expense of another trial. See full discussion of the subject of remittitur and additur in 13 Neb. Law Bulletin, 416.

In the light of the actual facts, and these former decisions of our court, it is the opinion of the court that the sum of $1,200 would be sufficient to cover all the damages to this farm in running this power line directly down the east boundary fence of this farm, and not angling across the farm, as happens in many cases.

The court is not substituting its judgment for that of the jury, and is not depriving the plaintiffs of another jury trial. We are simply indicating that, if a verdict had been rendered in the sum of $1,200, it would probably have met the approval of this court. The plaintiffs have the alternative of a reversal, with another trial to a jury, together with the expense and time involved therein, or they may file the remittitur suggested, and have the judgment stand affirmed. The decision as to which course will be taken must be made by the plaintiffs, and not by this court.

If the plaintiffs will file a remittitur within 30 days, reducing this judgment to $1,200, the judgment of the lower court will be affirmed, as thus modified, otherwise the judgment will stand reversed and remanded for a new trial.

AFFIRMED ON CONDITION.

CARTER, J., dissenting.

The plaintiff is entitled to recover for the depreciation of the general market value of his land resulting from the construction of the transmission line. This damage may include any reasonable fears arising from the construction of the power line that would depreciate its general market value. But such fears should be limited to dangers known and reckoned with by purchasers and vendors of real estate generally. Without such a foundation the evidence is not properly admitted for the jury's consideration. To permit the owner to testify to his personal fears, largely speculative and conjectural, without showing that the dangers upon which they were based were of such general knowledge as to affect the market value of the land is, in my

opinion, clearly erroneous. Also, the calling of electrical engineers as witnesses who recite dangers never heard of by the purchasing public, and therefore not affecting the general market value of the land, is likewise improper. A noted text-writer states the rule as follows: "Damages alleged to flow from the taking of part of a tract are not allowed if they can have no effect upon present market value. * * * Damage to remaining land from unfounded fears is not recoverable." 2 Nichols, Eminent Domain (2d ed.) 736.

In *Illinois Power & Light Corporation v. Cooper*, 322 Ill. 11, 152 N. E. 491, the court in discussing the question before us said: "Electricity is an element of great potential danger, in the control and use of which great care is necessary, and it may be that persons having no actual knowledge of the practical operation and effect of such lines heavily charged with electricity may fear the dangers which they imagine exist because of the location of the line on the property in question. If this is so, and by reason of such fear the persons affected are not willing to buy the lands on which the line is constructed, the law cannot regard the depreciation created by such a cause as resting upon any substantial basis and cannot allow any compensation on account of any claimed depreciation which is due to mere fear founded in reality upon lack of knowledge and not justified by the facts." The majority opinion cites *Kentucky Hydro-Electric Co. v. Woodard*, 216 Ky. 618, 287 S. W. 985, in support of its opinion. This case adopts the rule applied in *Alabama Power Co. v. Keystone Lime Co.*, 191 Ala. 58, 67 So. 833, as follows: "While, therefore, it is the intent of the law that all the actual damages which may naturally and proximately result to the remainder of a man's tract of land by reason of the condemnation of a right of way for a public purpose across it shall be paid to him, the law will not permit mere speculative elements of damages, based upon an ill-defined fear that at some unknown and indefinite time in the future some misfortune may come to some man or beast by reason of such improvement, to enter into the

consideration of those who, under the law, are required to fix the amount of the damages." Also, in *Kentucky Hydro-Electric Co. v. Reister,* 216 Ky. 303, 287 S. W. 357, cited by the writer of the majority opinion, the court followed the *Woodard* case and added: "The evidence in this case was, to a large extent, the opinions of witnesses who gave but few facts upon which these opinions were based. Necessarily the extravagance and groundlessness of these opinions is reflected in the verdict." It is noteworthy that both of these cases upon which the court relies were reversed and remanded *for a new trial.* And in *Yagel v. Kansas Gas & Electric Co.,* 131 Kan. 267, 291 Pac. 768, the Kansas court in a very exhaustive discussion of the subject of fear as an element of damage in a condemnation for an electric power line said: "Where a right of way for the erection or maintenance of towers and wires for the transmission of electricity is condemned, the owner may recover compensation for the actual damages arising from depreciation in the value of his remaining land, caused by the presence of these things upon the right of way; but the possible fears of prospective purchasers from their presence upon the right of way cannot be made a basis on which to predicate such depreciation or affect the amount of the recovery."

I submit that this court ought to establish a fair and dispassionate rule as to the competency of evidence on the question of fear in this type of case. To permit any and all persons to testify without foundation to speculative, conjectural, groundless and mythical dangers tends to create an orgy of fear that proper instructions cannot cure and which inevitably results in unconscionable verdicts. The difficulty arises from an unrestrained and indiscriminate admission of prejudicial evidence rather than from any errors in the instructing of the jury. In my judgment, the case should be reversed and remanded for a new trial in which the evidence of fear should be limited to those reasonable fears that affect the general market value of farm lands.

Another error, as grievous as the first, is contained in the court's opinion. I refer to the requirement that a remittitur of $683 be filed in lieu of a retrial. It has long been the rule in this state that, where a verdict of a jury is clearly against the weight and reasonableness of the evidence, it will be set aside and a new trial granted. *Bentley v. Hoagland,* 94 Neb. 442, 143 N. W. 465; *Stewart v. City of Lincoln,* 114 Neb. 362, 207 N. W. 511. I agree that, where the jury has made an error the extent of which the court can with some certainty ascertain, a remittitur is a proper remedy. *McKay, Munger & Wentz v. Hinman,* 13 Neb. 33, 13 N. W. 15; *Trester v. Pike,* 60 Neb. 510, 83 N. W. 676; *Ord Hardware Co. v. J. I. Case Threshing Machine Co.,* 83 Neb. 353, 119 N. W. 682; *Braun, Ray Bros. & Finley Co. v. Roberts Construction Co.,* 122 Neb. 182, 239 N. W. 924. But if there is no method by which the court can rationally ascertain the extent of the excess, a remittitur cannot be required. *Babbitt v. Union P. R. Co.,* 78 Neb. 410, 110 N. W. 1014. Under such circumstances a remittitur is nothing more than a substitution of the judgment of the court for that of the jury. The presumption is that an excessive verdict is the result of any prejudicial error that appears in the record. A remittitur therefore cannot properly be required in any case where the record discloses such error. Any other rule places the court in the position of appraising the amount of damage the error caused. A litigant gaining a verdict as a result of an appeal to passion and prejudice ought not to be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent. In almost every case similar to the one before us, the court has resorted to a remittitur to correct the errors occurring in the court below, even though there was no yardstick available by which the correctness of the remittitur could be measured. The perpetuation of an erroneous practice cannot supply the sound reason that should underlie its exercise. The usurpation of the functions of a jury by this court cannot be successfully condoned by a claim that it has acquired virtue

because the practice has become venerable with age and dignified by constant use.

The only justification offered in the majority opinion for imposing the requirement of a remittitur is that it has been done before on many occasions, which statement is supported by a list of cases and the amount of the remittitur allowed in each. It will be noted that the promiscuous use of the doctrine of remittitur by this court is of comparatively recent vintage. The court has gone astray only in very recent years. I might add that, while the listing of these cases may give the practice the force of numbers, it adds absolutely nothing to its legal soundness.

The writer of the majority opinion attempts to anticipate the argument that the court, by requiring a remittitur, is substituting its judgment for that of the jury by suggesting that the plaintiffs can choose between a remittitur and a retrial and that this obviates any requirement for another jury trial. The words of the majority opinion are the best evidence of the fallacy of this assertion: "The court is not substituting its judgment for that of the jury, and is not depriving the plaintiffs of another jury trial. We are simply indicating that, if a verdict had been rendered in the sum of $1,200, it would probably have met the approval of this court." It has always been my understanding that the defendant also was entitled to some consideration in the enforcement of constitutional rights. The defendant is not even placated with an option as a substitute for his constitutional right to a fair and impartial jury trial. The fact of the matter is that he is arbitrarily deprived of a jury trial and just as forcibly required to take something else in its place, and the substitute is a judgment against him, which, if rendered by the verdict of the jury, *would probably have met the approval of this court.*"

The majority opinion attempts to eliminate the question of passion and prejudice as the reason for the excessive verdict by saying: "So far as the amount of the verdict returned in this case by the jury is concerned, it cannot be set aside and disregarded as being arrived at through

passion and prejudice, for the verdict is well within the testimony returned by several of the witnesses." Later in the opinion the following is found: "The rule of this court has been that, on appeal in an action for damages, a judgment on a verdict which the clear preponderance of the evidence shows to be excessive may be reversed unless appellee files a remittitur for the excess." In the one statement the court in effect says there is no passion and prejudice because the evidence sustains the verdict, while in the other the court says the verdict is excessive by a clear preponderance of the evidence and imposes the requirement of a remittitur as a remedy for the jury's error. If an opinion be no stronger than its logic, I submit that this opinion can never be accepted as authoritative.

The verdict in the instant case was excessive because of passion and prejudice superinduced by the admission of incompetent evidence of conjectural fears and dangers not affecting the general market value of the land. Any excessive judgment, not the result of error, is in law the result of passion and prejudice. The remedy is the granting of a new trial and not the requirement of a remittitur. Passion and prejudice permeate the whole trial and vitiate the entire verdict. Obviously, passion and prejudice may be quite as effective in begetting a wholly wrong verdict as to produce an excessive one. For this court to say that $683 of the verdict was the result of the passion and prejudice of the jury and that the remaining $1,200 is free from any such vice constitutes, in my judgment, a trespass into the realms of the divine.

The following cases, in addition to the Nebraska cases cited, sustain my contention that a new trial is the only proper remedy in the instant case. *Rhyne v. Turley,* 37 Okla. 159, 131 Pac. 695; *Davis Iron Works Co. v. White,* 31 Colo. 82, 71 Pac. 384; *Cleveland Ry. Co. v. Mueller,* 31 Ohio App. 488, 166 N. E. 391; *Minneapolis, St. P. & S. S. M. R. Co. v. Moquin,* 283 U. S. 520, 51 S. Ct. 501, 75 L. Ed. 1243.

This court ought to impose upon itself the same discipline

with reference to the preservation of constitutional guaranties that it imposes upon other departments of government which the people have likewise been obliged to trust with power. Our very form of government requires that judicial decisions be based upon rules of law and not upon the whim or caprice of the judge. A failure to adhere to and maintain this principle can only result eventually in a form of judicial oppression.

SIMMONS, C. J., concurs in the dissent.

There does not appear to be a material dispute between the majority opinion and the dissent of Carter, J., on the rule as to the proper measure of damages in cases of this character. The dissent presents the question of the evidence properly admissible under the rule. I concur in the conclusion reached by Carter, J., in his dissent on that question, and likewise in his conclusion on the question of the remittitur ordered herein.